UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsd.uscourts.gov

EUGENE E. HOUCHINS III, AS
TRUSTEE OF THE SHARMIN
INGHRAM FAMILY INSURANCE
TRUST, a Georgia Trust; and
AMERICAN LIFE FUND CORP.,
a Georgia corporation,

      Plaintiffs,

vs.

NOAM S. WEISS; and
SETTLEMENT BENEFITS
ASSOCIATION, INC, a Florida
corporation doing business as
SETTLEMENT BENEFITS
ASSOCIATION,

      Defendants.
_____/

Case No.

**COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**
**[F.R.C.P., Rule 38]**

Plaintiffs complain against Defendants and allege:

<u>PARTIES</u>

1.    Plaintiff Eugene E. Houchins III, as Trustee of The Sharmin Inghram Family Insurance Trust [hereinafter referred to as "the Trustee"], is a resident of Georgia. The Sharmin Inghram Family Insurance Trust [hereinafter referred to as "the Trust"] is a Georgia trust.

2.    Plaintiff American Life Fund Corp. [hereinafter referred to as "American Life"] is a Georgia corporation with its principal place of business in Georgia.

3.    Defendant Noam S. Weiss [hereinafter referred to as "Weiss"] is a resident of Wellington, Florida. Weiss is, and at all times relevant to this complaint has been, a managing officer of SBA.

OLIVE | JUDD
ATTORNEYS AT LAW

4.      Defendant Settlement Benefits Association, Inc., doing business as Settlement Benefits Association [hereinafter referred to as "SBA"], is a Florida corporation with its principal place of business in Wellington, Florida.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the present action pursuant to 28 U.S.C. § 1332(a), in that there exists complete diversity of citizenship of the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

6.      This Court has personal jurisdiction over Weiss pursuant to Federal Rules of Civil Procedure, Rule 4(e), in that Weiss resides within this judicial district.

7.      This Court has personal jurisdiction over SBA pursuant to Federal Rules of Civil Procedure, Rule 4(k), in that SBA has its principal place of business within this judicial district.

8.      As to Weiss, the present action is properly venued in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c)(1), in that Weiss resides within this judicial district, and pursuant to 28 U.S.C. § 1391(b)(2), in that the wrongs of Weiss complained of in this action occurred within this judicial district.

9.      As to SBA, the present action is properly venued in this Court pursuant to 28 U.S.C. § 1391(b)(1), (c)(2), in that SBA has its principal place of business within this judicial district, and pursuant to 28 U.S.C. § 1391(b)(2), in that the wrongs of SBA complained of in this action occurred within this judicial district.

10.     All conditions precedent have been complied with or have otherwise been waived.

## GENERAL ALLEGATIONS

11.     At all times relevant to this complaint, Weiss has been employed by SBA as its managing officer.  All of the acts and omissions of Weiss alleged in this complaint were carried

out or committed by Weiss while acting within the proper and required scope of that employment and for the benefit of SBA.

12.     All of the acts and omissions of SBA alleged in this complaint were carried out or committed either (a) directly by Weiss or (b) by other employees of SBA acting at the behest and pursuant to the instructions of Weiss, with the prior and contemporaneous knowledge of Weiss, with the approval of Weiss, and with subsequent ratification by Weiss.

13.     At all times relevant to this complaint, SBA has been in the business of acting as a "life settlement broker" representing the owners and beneficiaries of life insurance policies who wish to sell and transfer their interests in those policies prior to the death of the insured. Specifically, SBA:

(a)  solicits the owners and beneficiaries of life insurance policies [each referred to hereinafter as a/the "Seller"] to hire SBA to act as their agent in arranging for, and implementing, such sale and transfer;

(b)  solicits prospective buyers for the Seller's policy; and

(c)  earns a substantial commission should a prospective buyer found by SBA in fact purchase that policy from the Seller.

14.     The typical situation in which such a transaction will occur is one in which the medical records of the insured indicate that the insured has been given a terminal diagnosis and/or has a short life expectancy.

15.     In every such transaction, SBA acts as the exclusive agent of the Seller.  In fulfilling that role, only SBA, and not the prospective buyer, has actual contact with the Seller.  Only SBA, and not the prospective buyer, has a HIPAA release from the insured granting access to the medical records that are crucial to the prospective sale.  SBA, as part of its published practices and pursuant

to the standard practice in the industry for avoiding potential fraud by a Seller:

(a)  uses its HIPAA release from the insured to obtain certified medical records directly from the insured's health care providers rather than relying on any records that may have been provided by the Seller or interested third parties;

(b)  vets those records for accuracy;

(c)  provides those directly-obtained and vetted records to the prospective buyer;

(d)  represents to the prospective buyer, and/or causes or allows the prospective buyer to assume, that the records provided were directly-obtained and vetted; and

(e)  understands that the buyer is at all relevant times relying on the abovementioned published practices, the above-mentioned standard practice in the industry, the above-mentioned representation, and/or the above-mentioned assumption.

16.    In every such transaction, SBA understands that should the medical records it obtains and provides to a prospective buyer be inaccurate – i.e., should the insured not actually have a terminal diagnosis and/or not actually have a short life expectancy – the buyer, purchasing the policy in reliance on those inaccurate records, would be getting something that was either totally or nearly worthless.  That result would follow inevitably from the fact that:

(a)  in the case of a term policy, the insured would likely live well beyond the term, in which case no death benefit would ever be paid and the buyer would lose its entire investment plus its expected return thereon; and

(b)  in the case of a whole life policy, the buyer, in order to maintain the policy in force, would have to pay premiums for as long as the insured remained alive – premiums the total amount of which would be likely exceed the difference between what the buyer had paid and the face value of the policy.

17.     The person or entity wishing to purchase a life insurance policy through the type of transaction described above may, at its discretion:

(a)  create an insurance trust that becomes the named buyer, owner, and beneficiary of the policy;

(b)  fund the trust with the monies needed for the purchase and for payment of premiums during the period the insured remains alive;

(c)  become the named beneficiary of the trust; and

(d)  select a trustee for the trust.

18.     Prior to November, 2017, SBA had entered into several transactions with American Life.  In each of those transactions, in accordance with the model and practices described above, the following had occurred:

(a)  SBA had solicited potential Sellers to engage SBA to act as their agent in arranging for, and implementing, the sale and transfer of the Seller's interests in a life insurance policy prior to the death of the insured;

(b)  SBA, having been contacted and engaged by a Seller, had solicited American Life to purchase the policy;

(c)  SBA had acted as the exclusive agent of the Seller;

(d)  SBA, in fulfilling that role, had been the only entity in contact with the Seller, to the exclusion of American Life;

(e)  SBA, in fulfilling that role, had been the only entity in the transaction to obtain and hold a HIPAA release from the insured allowing for direct access to medical records in the custody of the insured's health care providers;

(f)  SBA, in accordance with of its published practices and pursuant to the standard

practice in the industry for avoiding potential fraud by a Seller, had used that HIPAA release to obtain medical records directly from the insured's health care providers rather than relying on any records that might have been provided by the Seller or interested third parties, and had vetted those records for accuracy;

(g)  SBA, having obtained and vetted those records, had provided them to American Life, typically together with a third-party life-expectancy projection based thereon;

(h)  SBA, following American Life's decision – made in reliance on the abovementioned medical records and third-party life-expectancy projection provided by SBA – to move forward with the transaction, had negotiated the sale price on behalf of the Sellers; and

(i)  SBA had received a substantial commission pursuant to the sale.

19.  In several of those transactions, American Life had:

(a)  created an insurance trust that became the named buyer, owner, and beneficiary of the policy;

(b)  funded the trust with the monies needed for the purchase and for payment of premiums during the period the insured remains alive;

(c)  become the named beneficiary of the trust; and

(d)  selected a trustee for the trust.

20.  In or about October, 2017, SBA, as a result of its solicitation efforts on the internet and elsewhere, was contacted by Justin Inghram, a resident of South Dakota, about the possibility of SBA's finding a buyer for Pruco Life Insurance Company Policy No. 19122260 [the Policy"]. The Policy insures the life of Justin Inghram's wife, Sharmin Inghram, for a ten-year term, i.e., through October, 2024, with a death benefit of $1,500,000.  Sharmin Inghram was the owner of the Policy.  Justin Inghram was the named beneficiary under the Policy.

21.     Justin Inghram orally indicated to SBA, and Sharmin Inghram subsequently represented to SBA in writing, that Sharmin Inghram had been diagnosed with liver cancer.  In addition, Justin Inghram provided SBA with purported medical records in Justin Inghram's possession that appeared to confirm that diagnosis, stating that Sharmin Inghram suffered from Stage IV bile duct cancer that had metastasized to her liver.  That diagnosis, if accurate, meant that Sharmin Inghram would almost certainly pass away within approximately twelve months – well before the end of the Policy term.

22.     SBA undertook to act as the Inghrams' agent in seeking a buyer for the Policy.

23.     Pursuant to that agency, SBA obtained a HIPAA release from Sharmin Inghram. That release enabled SBA to obtain Sharmin Inghram's medical records directly from her health care providers.

24.     Also pursuant to that agency, and with the aim of obtaining a substantial commission, SBA solicited American Life to purchase the Policy.

25.     SBA represented to American Life its view that Sharmin Inghram was dying of liver cancer, that SBA was in possession of a HIPAA release from Sharmin Inghram, and that SBA – in accordance with its published practices and pursuant to the standard practice in the industry for avoiding potential fraud by a Seller, as well as its prior business dealings with American Life – was in the process of obtaining medical records directly from Sharmin Inghram's health care providers, and vetting those records for accuracy once they had been obtained, in order to confirm Sharmin Inghram's medical condition.

26.     SBA, despite having been in possession of a HIPAA release that would have allowed SBA to obtain Sharmin Inghram's medical records directly from her health care providers and vet them for accuracy, and despite knowing that American Life was waiting to receive those

directly-obtained and vetted records in order to make a decision about whether or not to buy the Policy, never did obtain those records.  Instead, SBA provided American Life with the purported medical records it had received from Justin Inghram.  In doing so, SBA referred to those purported medical records as Sharmin Inghram's medical records and failed to alert American Life to the fact that those purported medical records had come solely from Justin Inghram rather than directly from Sharmin Inghram's health care providers.

27.    SBA also used the purported medical records it had received from Justin Inghram to obtain a life-expectancy projection for Sharmin Inghram from a company called American Viatical Services, LLC [hereinafter referred to as "AVS"].  On information and belief, SBA did not inform AVS that those purported medical records had come from the husband of the insured rather than directly from the insured's health care providers.  Relying on those purported medical records, AVS projected that Sharmin Inghram had a life expectancy of twelve months.  SBA then provided that projection to American Life, again failing to alert American Life to the fact that the projection was based on purported medical records that had come solely from Justin Inghram rather than on medical records that had come directly from Sharmin Inghram's health care providers and been vetted by SBA for accuracy.

28.    American Life, for the reasons set forth above, at all times reasonably assumed and believed:

(a)  that the purported medical records it had received from SBA were medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy; and

(b)  that the life-expectancy projection issued by AVS was based on medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for

accuracy.

29.     Relying on those assumptions and beliefs, American Life entered with SBA into negotiations to buy the Policy.

30.     Following those negotiations, American Life – again reasonably relying on the assumptions and beliefs that the purported medical records it had received from SBA were medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy, and that the life-expectancy projection issued by AVS was based on medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy – agreed to a purchase price for the Policy of $1,185,000, with $230,000 of that amount to be paid to SBA as a commission.

31.     In or about November, 2017, American Life:

        (a)  created the Trust to become the named buyer, owner, and beneficiary of the Policy;

        (b)  funded the Trust with the monies needed for purchase of the Policy and for payment of Policy premiums during the period the insured remained alive;

        (c)  became the named beneficiary of the Trust; and

        (d)  selected Eugene Houchins III as the Trustee.

32.     Shortly thereafter, again in or about November, 2017, the Trustee – reasonably relying on the assumptions and beliefs that the purported medical records that American Life had received from SBA were medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy, and that the life-expectancy projection issued by AVS was based on medical records obtained by SBA directly from Sharmin Inghram's health care provider and vetted by SBA for accuracy –  purchased the Policy on the terms that had been

negotiated between American Life and SBA.

33. Had American Life known (a) that the purported medical records American Life had received from SBA had been obtained by SBA from Justin Inghram and were not medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy, and (b) that the life-expectancy projection issued by AVS was based on the purported medical records obtained by SBA from Justin Inghram and not on medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy, American Life would have deemed the risk of falsification or other fraud to be unacceptably high and would not have negotiated the purchase of the Policy.

34. Had the Trustee known (a) that the purported medical records American Life had received from SBA had been obtained by SBA from Justin Inghram and were not medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy, and (b) that the life-expectancy projection issued by AVS was based on the purported medical records obtained by SBA from Justin Inghram and not on medical records obtained by SBA directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy, the Trustee would have deemed the risk of falsification or other fraud to be unacceptably high and would not have purchased the Policy.

35. In fact, the purported medical records provided to American Life and to AVS by SBA had been falsified. Specifically, and contrary to what was stated in those purported medical records:

(a) Sharmin Inghram had never been diagnosed with Stage IV bile duct and liver cancer;

(b) Sharmin Inghram was not terminally ill and did not have a life expectancy

measured in months rather than decades; and

>    (c)  Sharmin Inghram had no life-threatening conditions whatsoever.

36.    At all times during the abovementioned negotiations between American Life and SBA, and at the time the Trustee purchased the Policy, neither American Life nor the Trustee knew, and in the exercise of due care could not have known or discovered, that the purported medical records provided to American Life and to AVS by SBA had been falsified as noted above. American Life and the Trustee did not discover, and in the exercise of due care could not have discovered, the falsification until in or about May, 2018, six months after the purchase of the Policy.  At that time, American Life – pursuant to its routine practice of monitoring the ongoing medical condition of insureds under policies in which American Life held a beneficiary interest – used the HIPAA release it had been granted following the purchase of the Policy to obtain medical records directly from Sharmin Inghram's health care providers.  Those medical records revealed the falsification.

37.    Had American Life known (a) that Sharmin Inghram had never been diagnosed with Stage IV bile duct and liver cancer, (b) that Sharmin Inghram was not terminally ill and did not have a life expectancy measured in months rather than decades, (c) that Sharmin Inghram had no life-threatening conditions whatsoever, and (d) that, as noted above, the purported medical records provided to American Life and to AVS by SBA had been falsified, American Life would have deemed the Policy to be of no value and would not have negotiated the purchase of the Policy.

38.    Had the Trustee known (a) that Sharmin Inghram had never been diagnosed with Stage IV bile duct and liver cancer, (b) that Sharmin Inghram was not terminally ill and did not have a life expectancy measured in months rather than decades, (c) that Sharmin Inghram had no life-threatening conditions whatsoever, and (d) that, as noted above, the purported medical records

provided to American Life and to AVS by SBA had been falsified, the Trustee would have deemed the Policy to be of no value and would not have purchased the Policy.

FIRST COUNT
(Negligence – Weiss and SBA)

39.     The Trustee and American Life refer to, and by that reference incorporate and reassert in the present count, each of the allegations contained in paragraphs 1 through 38 of this complaint.

40.     At all relevant times, Weiss, pursuant to (a) SBA's having had sole possession of Sharmin Inghram's HIPAA release and sole direct access to medical records from her health care providers, (b) SBA's published practices, (c) SBA's prior course of dealing with American Life, (d) standard practices in the industry, and (e) the reasonable expectations of the parties, all as set forth above, had a duty of due care:

(a)     to obtain medical records directly from Sharmin Inghram's health care providers and vet those records for accuracy, and to ensure that SBA obtain medical records directly from Sharmin Inghram's health care providers and vet those records for accuracy;

(b)     to provide American Life with medical records obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than with purported medical records obtained solely from Justin Inghram, and to ensure that SBA provide American Life with medical records obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than with purported medical records obtained solely from Justin Inghram;

(c)     to provide AVS with medical records obtained directly from Sharmin Inghram's health care providers rather than with purported medical records obtained solely from Justin Inghram, and to ensure that SBA provide AVS with medical records obtained directly from

12
OLIVE | JUDD
ATTORNEYS AT LAW

Sharmin Inghram's health care providers rather than with purported medical records obtained solely from Justin Inghram;

(d)      to inform American Life and/or the Trustee that SBA, contrary to SBA's published practices, contrary to SBA's prior course of dealing with American Life, and contrary to standard practices in the industry, had not obtained medical records directly from Sharmin Inghram's health care providers and thus had not taken the usual and necessary steps to avoid fraud by the Inghrams, and to ensure that SBA inform, American Life and/or the Trustee that SBA, contrary to SBA's published practices, contrary to SBA's prior course of dealing with American Life, and contrary to standard practices in the industry, had not obtained medical records directly from Sharmin Inghram's health care providers and thus had not taken the usual and necessary steps to avoid fraud by the Inghrams;

(e)      to not cause or allow American Life and/or the Trustee to believe, incorrectly, that the records provided to American Life by SBA had been obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram, and to ensure that SBA not cause or allow American Life and/or the Trustee to believe, incorrectly, that the records provided to American Life by SBA had been obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram; and/or

(f)      to not cause or allow American Life and/or the Trustee to believe, incorrectly, that the records provided to AVS by SBA had been obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram, and to ensure that SBA not cause or allow American Life and/or the Trustee to believe, incorrectly, that the records provided to AVS by SBA had been obtained directly from

Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram.

41.     Furthermore, by electing to disclose material facts to Plaintiffs with respect to Sharmin Inghram's medical condition and the proposed transaction, Weiss thereby undertook a duty to disclose all material facts and to disclose the whole truth with respect to those matters.

42.     Weiss breached the aforementioned duties by:

(a)     negligently failing to obtain medical records directly from Sharmin Inghram's health care providers and vet those records for accuracy, and negligently failing to ensure that SBA obtain medical records directly from Sharmin Inghram's health care providers and vet those records for accuracy;

(b)     negligently failing to provide American Life with medical records obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than with purported medical records obtained solely from Justin Inghram, and negligently failing to ensure that SBA provide American Life with medical records obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than with purported medical records obtained solely from Justin Inghram;

(c)     negligently failing to provide AVS with medical records obtained directly from Sharmin Inghram's health care providers rather than with purported medical records obtained solely from Justin Inghram, and negligently failing to ensure that SBA provide AVS with medical records obtained directly from Sharmin Inghram's health care providers rather than with purported medical records obtained solely from Justin Inghram;

(d)     negligently failing to inform American Life and/or the Trustee that SBA, contrary to SBA's published practices, contrary to SBA's prior course of dealing with American

Life, and contrary to standard practices in the industry, had not obtained medical records directly from Sharmin Inghram's health care providers and thus had not taken the usual and necessary steps to avoid fraud by the Inghrams, and negligently failing to ensure that SBA inform American Life and/or the Trustee that SBA, contrary to SBA's published practices, contrary to SBA's prior course of dealing with American Life, and contrary to standard practices in the industry, had not obtained medical records directly from Sharmin Inghram's health care providers and thus had not taken the usual and necessary steps to avoid fraud by the Inghrams;

(e)     negligently causing or allowing American Life and/or the Trustee to believe, incorrectly, that the records provided to American Life by SBA had been obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram, and negligently causing SBA to cause or allow American Life and/or the Trustee to believe, incorrectly, that the records provided to American Life by SBA had been obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram; and/or

(f)     negligently causing or allowing American Life and/or the Trustee to believe, incorrectly, that the records provided to AVS by SBA had been obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram, and negligently causing SBA to cause or allow American Life and/or the Trustee to believe, incorrectly, that the records provided to AVS by SBA had been obtained directly from Sharmin Inghram's health care providers and vetted by SBA for accuracy rather than obtained solely from Justin Inghram.

43.     As a foreseeable result of those breaches, and for the reasons set forth above, American Life created and funded the Trust so that the Trustee could and would purchase the

Policy – a policy which, unbeknownst to American Life, essentially had no value – for $1,185,000, with an expected death benefit of $1,500,000 after twelve months.  But for those breaches, American Life would not have done so, and those breaches were a substantial factor in causing American Life to do so.

44.     As a further foreseeable result of those breaches, and for the reasons set forth above, the Trustee purchased the Policy – a policy which, unbeknownst to the Trustee, essentially had no value – for $1,185,000, with an expected death benefit of $1,500,000 after twelve months.  But for those breaches, the Trustee would not have done so, and those breaches were a substantial factor in causing the Trustee to do so.

45.     As a proximate result of those breaches, the Trustee, as owner of and beneficiary under the Policy, has been damaged in an amount subject to proof at trial but in any case greater than $1,185,000.

46.     As a further proximate result of those breaches, American Life, as funder of the Trust and beneficiary of the Trust, has been damaged in an amount subject to proof at trial but in any case greater than $1,185,000.

47.     Due to Weiss' role as a managing officer and high-level representative of SBA, Weiss' acts are indistinguishable from those of SBA and SBA may be held directly liable therefore.

48.     The Trustee and American Life, and each of them, have taken all reasonable steps to mitigate damages.

WHEREFORE, the Trustee and American Life pray judgment against Weiss and SBA as set forth below.

## SECOND COUNT
### (Fraud – Weiss and SBA)

49.     The Trustee and American Life refer to, and by that reference incorporate and reassert in the present count, each of the allegations contained in paragraphs 1 through 38 of this complaint.

50.     Weiss made false representations to Plaintiffs, including specifically false representations by omission of presently existing material facts, by furnishing falsified medical records to Plaintiffs and by failing to inform Plaintiffs that the medical records had not been obtained directly from Sharmin Inghram's health care providers and had not been vetted for accuracy.

51.     By electing to disclose material facts to Plaintiffs with respect to Sharmin Inghram's medical condition and the proposed transaction, Weiss thereby undertook a duty to disclose all material facts and to disclose the whole truth with respect to those matters.

52.     The false representations and omissions were made to Plaintiffs by Weiss at various times in or about October and November of 2017 as alleged above.

53.     Weiss knew that his representations and omissions were false at the time he made them, and he made them for the purpose of inducing Plaintiffs' reliance on such statements.

54.     Weiss intended, knew, and/or should have known that Plaintiffs would rely on his false representations and omissions by purchasing the Policy and otherwise proceeding with the proposed transaction.

55.     Plaintiffs, acting in ignorance of the falsity of Weiss' representations and omissions, reasonably relied upon the false representations and omissions in purchasing the Policy and otherwise proceeding with the proposed transaction.

56.     Weiss' fraudulent representations and omissions have injured and damaged

Plaintiffs by, among other things:

(a)     Causing American Life to create and fund the Trust so that the Trustee could and would purchase the Policy – a policy which, unbeknownst to American Life, essentially had no value – for $1,185,000, with an expected death benefit of $1,500,000 after twelve months.

(b)     Causing Trustee to purchase the Policy – a policy which, unbeknownst to the Trustee, essentially had no value – for $1,185,000, with an expected death benefit of $1,500,000 after twelve months.

(c)     Causing Trustee, as owner of and beneficiary under the Policy, to be damaged in an amount subject to proof at trial but in any case greater than $1,185,000.

(d)     Causing American Life, as funder of the Trust and beneficiary of the Trust, to be damaged in an amount subject to proof at trial but in any case greater than $1,185,000.

57.     Furthermore, Plaintiffs are entitled to punitive damages insofar as Weiss' fraudulent conduct (1) was the result of willful, wanton, malicious, and intentionally fraudulent conduct, (2) manifested a knowing and reckless indifference toward, and disregard of, the rights of others (including Plaintiffs), (3) showed such an entire lack of care that Weiss must have been consciously indifferent to the consequences; and/or (4) showed such reckless indifference to the rights of others as to be equivalent to an intentional violation of those rights.

58.     Due to Weiss' role as a managing officer and high-level representative of SBA, Weiss' acts are indistinguishable from those of SBA and SBA may be held directly liable therefore.

59.     The Trustee and American Life, and each of them, have taken all reasonable steps to mitigate damages.

### THIRD COUNT
(Vicarious Liability - SBA)

60.     The Trustee and American Life refer to, and by that reference incorporate and reassert in the present count, each of the allegations contained in paragraphs 1 through 38 of this complaint.

61.     Plaintiffs contend in Counts I and II herein that, due to Weiss' role as a managing officer and high-level representative of SBA, Weiss' acts are indistinguishable from those of SBA and SBA may be held directly liable therefore.

62.     In addition or the alternative, pursuant to the doctrine of *respondeat superior*, SBA is vicariously liable to the Trustee and to American Life for any and all damages they may have suffered as a proximate result of the negligent and fraudulent acts and omissions of Weiss alleged in this complaint.

63.     All of the acts and omissions of Weiss alleged in this complaint were carried out or committed by Weiss while acting within the proper and required scope of that employment and for the benefit of SBA.

64.     Weiss' conduct was of the kind he was employed to perform, occurred substantially within the time and space limits authorized or required by the work to be performed, and was activated at least in part by a purpose to serve the master, SBA.

WHEREFORE, the Trustee and American Life pray judgment against SBA as set forth below.

### PRAYER

The Trustee and American Life pray judgment against defendants and each of them, jointly and severally, as follows:

A.      For damages in an amount subject to proof at trial, but in any case greater than

$1,185,000, as well as punitive damages, and pre-judgment and post-judgment interest.

B.      For the Trustee's and American Life's reasonable costs of suit incurred herein.

C.      For whatever other relief the Court may deem just.

Respectfully submitted:        June 11, 2021

OLIVE JUDD, P.A.

/s/ Benjamin E. Olive
Benjamin E. Olive, Esq.
Fla. Bar No.: 387983
bolive@olivejudd.com
Matthew C. Sanchez, Esq.
Fla. Bar No.: 72748
msanchez@olivejudd.com
2426 E. Las Olas Boulevard
Fort Lauderdale, FL  33301
Telephone:  (954) 334-2250
Facsimile: (954) 334-2259

[Admission *pro hac vice* will be
sought for:
HENNEFER FINLEY & WOOD, LLP
JOSEPH WOOD [California SBN 103596]
235 Montgomery Street, Suite 858
San Francisco, CA  94104
Telephone:  (415) 421-6100]
jwood@hennefer-wood.com; jhcwlaw@yahoo.com]

Attorneys for Plaintiffs, Eugene E. Houchins III,
as Trustee of The Sharmin Inghram Family
Insurance Trust, and American Life Fund Corp.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure, Rule 38, plaintiffs, Eugene E. Houchins III,

as Trustee of The Sharmin Inghram Family Insurance Trust, and American  Life Fund Corp.,

hereby demand trial by jury in this action on all issues so triable.

DATED:        June 11, 2021

OLIVE JUDD, P.A.

/s/ Benjamin E. Olive
Benjamin E. Olive, Esq.
Fla. Bar No.: 387983
bolive@olivejudd.com
Matthew C. Sanchez, Esq.
Fla. Bar No.: 72748
msanchez@olivejudd.com
2426 E. Las Olas Boulevard
Fort Lauderdale, FL  33301
Telephone:  (954) 334-2250
Facsimile: (954) 334-2259

Attorneys for Plaintiffs, Eugene E. Houchins III,
as Trustee of The Sharmin Inghram Family
Insurance Trust, and American Life Fund Corp.